HONORABLE RONALD B. LEIGHTON

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| ETM IV SPECIAL LLC,<br><br>Plaintiff,<br><br>v.<br><br>PEDIGREE CATS, INC., et al.,<br><br>Defendants. | CASE NO. C13-5044 RBL<br><br>ORDER DENYING MOTION FOR PARTIAL SUMMARY JUDGMENT<br><br>[Dkt. #25] |

## I.   INTRODUCTION

THIS MATTER is before the Court on Defendant Habersetzer's Motion for Partial Summary Judgment. [Dkt. #25].

The case involves the design and construction of "Little Goose," a custom 75-foot sportfishing yacht. Plaintiff ETM (and its sole owner, Edwin T. Meredith), engaged an apparently well-known Australian naval architect, Stuart Bloomfield, to design a yacht—specifically, a 65 foot power catamaran suitable for offshore fishing. Through Bloomfield, Meredith identified, interviewed, and ultimately hired Defendant Pedigree Cats to build the yacht. While vetting Pedigree's qualifications, Meredith met with its owner, Defendant Habersetzer, who assured Meredith that he, his company, and its various employees were

experienced, qualified, and willing and able to build the luxury yacht Meredith had commissioned.

Unfortunately, from her launch (pictured below) Little Goose was plagued with design, quality, and construction defects. She immediately sat two feet "bow-down" in the water, her ineffective rudders made her difficult to handle, and she was unable to make half her design speed. Pedigree spent several months trying to remedy the problems, but it could not. Meredith reluctantly and under protest took delivery of Little Goose so that he could deliver her to a "competent" shipyard in southern California for repairs. On the way, Little Goose's hull began to delaminate due to additional, previously unknown defects. The crew was forced to put in to a different shipyard for emergency repairs on the way south.

Through the LLC he created to own the boat, Plaintiff ETM IV Special LLC, Meredith sued Pedigree for breach of contract and breach of warranty. He also sued Habersetzer personally for negligent misrepresentation, fraud, and violations of Washington's Consumer Protection Act, claiming that Habersetzer misrepresented both his own and his company's qualifications, experience, and abilities.

Habersetzer asks the Court to summarily dismiss all of Meredith's claims against him personally. He argues he made only vague statements of opinion and future events, not actionable false statements related to existing facts. Habersetzer also argues that he made all of his statements and representations on behalf of Pedigree, and thus cannot be held personally liable for them in any event.

## II.  BACKGROUND



*Little Goose*

In the fall of 2007, Meredith was searching for a yacht builder capable of constructing a custom-built power catamaran "sport fisher." Meredith had selected Bloomfield to design the yacht, and learned of Pedigree through Bloomfield's website. Meredith began considering Pedigree, and through its website learned that it was a builder of custom multihull yachts which were built to both American Boat & Yacht Council standards and to the standards required by European Union countries.

After initial discussions with Habersetzer, Meredith visited Pedigree's facility. Meredith claims that during Habersetzer's sales pitch, he assured Meredith that he had built many sailing and power catamarans for some very happy customers, yet due to privacy concerns for his previous high net worth customers, could not provide the customer information to Meredith. Habersetzer also informed Meredith that he had worked with Bloomfield in the past, had a good working relationship with him, and would work with him throughout the construction of Meredith's yacht. Meredith showed Habersetzer photos of another Bloomfield-designed yacht

built by a Brazilian manufacturer, and Habersetzer assured Meredith that Pedigree could produce a yacht of equal quality. Finally, Habersetzer claimed that due to the downturn in the economy, other shipyards in the region had suffered, and Pedigree had access to the most qualified tradesmen in the Pacific Northwest.

Even though Pedigree had very happy customers and despite the fact that each Pedigree yacht took years to produce, Habersetzer informed Meredith that Pedigree happened to have an immediate opening in its construction schedule—all it would take to commence the project was the first payment. Meredith agreed to have Pedigree construct his yacht.

When Meredith received word that the yacht was nearing completion, he hired a full-time captain who traveled to Pedigree's facilities. The captain subsequently informed Meredith that not only was the yacht far from complete, but it was fraught with issues, and was largely being built by inexperienced workers supervised by a logger, rather than tradesmen from the abundant crop of available boatbuilders in the Pacific Northwest. Furthermore, Habersetzer had not maintained contact and consultation with Bloomfield throughout the construction process—particularly when he modified the yacht to increase its length from Bloomfield's 65-foot design to 75 feet. Lacking proper detailed drawings and specifications for the construction of Little Goose, Habersetzer instead gave his employees basic drawings and pictures from the designer, and told them to "make it look like the pictures." [Dkt. #32 at 3].

Meredith also discovered that Habersetzer and Pedigree may not have enjoyed the history of successful builds that Meredith was led to believe. Not only had Pedigree completed just two yachts for previous customers—three total, including one for Habersetzer himself—but at least one of those customers, Dr. Frank Lyons, was anything but "happy." Pedigree delivered to Lyons a 52-foot yacht that was constructed from a "used" 62-foot catamaran shell, and the yacht

was not even seaworthy due to extreme weight and balance issues. Indeed, even after Dr. Lyons paid full price under the fixed price contract, his yacht was less than one-third complete. Instead of scrapping the boat, Dr. Lyons transferred it to a different shipyard for completion.[1]

Meredith spent several months working with Pedigree through its attempts to correct Little Goose's deficiencies. Unhappy with Pedigree's progress, Meredith took delivery of the yacht in order to transport her to a shipyard in San Diego for further repairs (a voyage ultimately delayed by the previously mentioned pit stop necessitated by Little Goose's structural delamination). At the time of briefing on this motion, Little Goose was still located in San Diego undergoing repairs at an expense of more than $1 million. Meredith sued to recover these expenses.

### III.    DISCUSSION

Summary judgment is appropriate when, viewing the facts in the light most favorable to the nonmoving party, there is no genuine issue of material fact which would preclude summary judgment as a matter of law.  Once the moving party has satisfied its burden, it is entitled to summary judgment if the non-moving party fails to present, by affidavits, depositions, answers to interrogatories, or admissions on file, "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "The mere existence of a scintilla of evidence in support of the non-moving party's position is not sufficient." *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). Factual disputes whose resolution would not affect the outcome of the suit are irrelevant to the consideration of a motion for summary

---

[1] According to Meredith, the other prior customer, Jack McCormick, did not want to get involved, possibly because he is actively trying to sell his yacht. Habersetzer submitted a letter from McCormick indicating that he has enjoyed various voyages on the yacht and believes it is a high quality vessel.

judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In other words, "summary judgment should be granted where the nonmoving party fails to offer evidence from which a reasonable [fact finder] could return a [decision] in its favor." *Triton Energy*, 68 F.3d at 1220.

     A.     **Misrepresentation**

     In support of his Motion for Partial Summary Judgment, Habersetzer first argues that Meredith's misrepresentation claims fail as a matter of law because each of Habersetzer's statements are either statements of opinion, statements relating to a future event, or that Meredith has failed to produce any evidence demonstrating the statement's falsity. Both negligent misrepresentation and intentional misrepresentation (fraud) are predicated on a false statement of a presently existing fact. *Havens v. C & D Plastics, Inc.*, 124 Wn.2d 158, 182, 876 P.2d 435 (1994); *Stieneke v. Russi*, 145 Wn.App. 544, 190 P.3d 60, 70 (2008).

     The parties agree that some of Habersetzer's statements relate to promises of future performance, and therefore cannot provide the basis for a misrepresentation action. *See W. Coast, Inc. v. Snohomish Cnty.*, 112 Wn. App. 200, 206, 48 P.2d 997 (2002). Additionally, some of Habersetzer's statements express an opinion or amount to puffery (e.g., "PCI's catamarans are virtually unsinkable"), and similarly provide unsuitable foundation for a misrepresentation claim. In his response, Meredith boils down the statements he relies on in support of his misrepresentation claims, asserting that at least seven of the statements made by Habersetzer are false statements relating to a presently existing fact. Habersetzer disputes the merits of each statement and whether it can form the basis for a misrepresentation action, and concludes by asserting that he cannot be held personally liable for the statements he made as Pedigree's agent in any event.

### 1.     Pedigree's Abilities

First, Meredith bases his misrepresentation claims on Habersetzer's statement when shown the picture of the Bloomfield-designed catamaran built by the Brazilian boatbuilder, asserting that he and his company were qualified and had the experience to "produce a vessel of equal quality." [Dkt. #34 at 3]. Certain representations regarding past experience will support an action in misrepresentation. For example, Meredith relies on *Cutaia v. Radius Eng'g Int'l, Inc.*, where the district court determined the defendant's representation that he had installed a "Radius dome" survival shelter before was a presently existing fact. *Cutaia v. Radius Eng'g Int'l, Inc.*, No. 5:11CV00077, 2013 WL 5491868, at *6 (W.D. Va. Oct. 2, 2013). Unlike *Cutaia*, however, Habersetzer's representations as to his and his company's experience is an opinion of ability—whether they *are* capable of producing something, not whether they *have* produced something specific in the past.

### 2.     Employee Experience

Second, Meredith bases his claims on Habersetzer's statements about the experience of his employees. Habersetzer represented that Pedigree "had 'the pick of the litter,' the best, most qualified yacht construction workers available in the Pacific Northwest," and that Pedigree's workers "were better trained and experienced than the workers employed by Westport Shipyard." [Dkt. #34 at 3]. While the extent of a worker's experience and training may present a mere difference in opinion, Meredith has produced evidence that many of the workers employed by Pedigree had *no* prior experience at all, were supervised by inexperienced employees, and were given no training by Pedigree. Even the Little Goose "project supervisor"—responsible for

supervising workers who should themselves have relevant training[2]—had literally no prior boatbuilding experience. He was instead a former choker setter in the local logging industry.

### 3. Customer Satisfaction

Third, Meredith bases his claims on Habersetzer's representation that "he had made many prior large sailing catamarans and power cats for some very happy customers." While customer satisfaction is also subjective by nature, the satisfaction of customers at the ends of the spectrum amount to questions of fact. Of the two previously completed Pedigree catamarans, Dr. Lyons was extremely unhappy; thus, Habersetzer could not have had "some very happy customers."[3] This is at least a question of fact for the fact finder.

### 4. Value of Pedigree-built Yachts

Fourth, Meredith offers Habersetzer's statement that "based on the experience of the owners of the other boats he had built," Meredith's boat would be worth more money than he had into it as soon as it was launched. [Dkt. #34 at 7]. Whether prior customers' yachts were immediately worth more than their cost is a presently existing fact. Meredith has produced evidence upon which a jury could determine this statement to be false—namely, Dr. Lyon's declaration. When Dr. Lyon received his yacht from Pedigree, it was "worth much less than the amount of money" he had paid to Pedigree and Habersetzer for its construction. [Dkt. #35 at 3].

---

[2] Pedigree's CEO, Defendant Kelly Habersetzer, explained the importance of proper training in an interview with a local paper just this year: "Master marine carpenters have to be experienced in the woods and techniques used in boatbuilding.… '[T]hey need to have specialty [training] in their trade.'" Mike Williams, *Boatyard May Sail Out of Town For Good in Dispute With Port*, DAILY ASTORIAN (Apr. 4, 2014), http://www.dailyastorian.com/20140404/boatyard-may-sail-out-of-town-for-good-in-dispute-with-port (quoting Pedigree CEO Kelly Habersetzer).

[3] At least one other party was unhappy enough to sue Habersetzer and Pedigree for fraud and CPA violations in 1997. *See Munro v. Habersetzer*, 97-cv-05408-JKA (filed Jun. 27, 1997).

### 5. Yacht Construction Standards

The fifth statement at issue is Habersetzer's claim "[t]hat the yachts built by PCI met ABYC and European yacht construction standards." This is an affirmative statement of a presently existing fact. [Dkt. #30 at 13]. It is neither a promise of future performance (that ETM's yacht *would be built* to ABYC and European yacht construction standards) nor a statement of opinion (PCI's previous yachts were either built to the standards, or they were not). Meredith presented sufficient evidence that at least one of the two yachts Pedigree had previously "completed"—Dr. Lyon's—was not in fact built to ABYC standards. Additionally, there is evidence that Little Goose was not built to those standards.

### 6. Strength of Pedigree's Hulls

Sixth, Habersetzer's statement that "the hulls built by PCI were 35 times stronger than solid fiberglass, wood or aluminum" is a statement of existing fact. [Dkt. #34 at 3]. The marine survey conducted on Little Goose suggests that Pedigree's construction techniques and materials are, in fact, no stronger than the other materials and techniques used in standard yacht construction.

### 7. Relationship With Bloomfield

The final statement that Meredith's misrepresentation claims are based on is Habersetzer's assertion that "he had worked with Mr. Bloomfield in the past, that he had a good working relation with Mr. Bloomfield, and that if contracted to build the yacht, would work directly with Mr. Bloomfield to complete the proper design of the yacht." Whether Habersetzer had in fact worked with Bloomfield in the past, and to some degree whether it was a good working relationship, was an existing fact. Even Habersetzer's own testimony provides conflicting evidence as to whether he had in fact previously worked with Bloomfield. Viewed in

the light most favorable to Meredith, the evidence would permit a jury to find that this statement was intentionally false, and that Meredith reasonably relied on it, to his detriment.

### 8. Personal Liability as Agent

Habersetzer last argues that even if some of his statements falsely convey existing facts, he is not personally liable for them because the statements were made while Habersetzer was acting as Pedigree's agent. When an agent makes representations, knowing them to be false, the agent may be personally liable to an injured party. *Lasman v. Calhoun, Denny & Ewing*, 111 Wash. 467, 470, 191 P. 409 (1920). The only question left to determine is whether Habersetzer honestly believed the representations made to Meredith to induce him to contract with Pedigree were true. *See Annechino v. Worthy*, 175 Wn.2d 630, 638, 290 P.3d 126 (2012). Meredith has presented sufficient evidence for a fact finder to decide this question. For example, if the fact finder determines that Habersetzer never worked with Bloomfield prior to his conversation with Meredith, it would be clear that Habersetzer could not have honestly believed his statements to be true.

Viewed in the light most favorable to the non-moving party, several of the alleged statements falsely convey presently existing facts. Habersetzer's Motion for Partial Summary Judgment on Meredith's negligent and intentional misrepresentation claims is DENIED.

### B. Consumer Protection Act

Habersetzer next argues that Meredith's CPA claim also fails as a matter of law because he did not deceive Meredith, for many of the same reasons offered in his arguments against the misrepresentation claims. Additionally, Habersetzer argues that the claim must fail because the harm arose from a private contract made on behalf of the corporate entity Pedigree.

In a private CPA action, a plaintiff must establish that the defendant (1) engaged in an unfair or deceptive act, which (2) occurred in commerce, (3) affected the public interest, and (4)

proximately caused, (5) damage to the plaintiff's business or property. *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wn.2d 778, 784-85, 719 P.2d 531 (1986). Habersetzer argues that Meredith cannot demonstrate elements 1, 2, and 3 as a matter of law.

First, Habersetzer argues that his conduct was not unfair or deceptive. An act is considered unfair or deceptive when it misleads or misrepresents something of material importance. *Holiday Resort Cmty. Ass'n v. Echo Lake Assocs., LLC*, 134 Wash. App. 210, 226, 135 P.3d 499 (2006), *as amended on denial of reconsideration (Aug. 15, 2006)*. The misrepresentations discussed above induced Meredith to contract with Pedigree. Understandably, Pedigree's experience and qualifications were of grave importance to Meredith when considering Pedigree, and specifically Habersetzer, for the construction of the costly offshore fishing vessel.

Next, Habersetzer argues that he did not engage in commerce individually, and only did so in the corporate form of Pedigree. Washington law is clear that a corporate officer that participates in conduct in violation of the CPA is personally liable. *Aungst v. Roberts Constr. Co.*, 95 Wn.2d 439, 442, 625 P.2d 167 (1981); *Jackson v. Harkey*, 41 Wash. App. 472, 480, 704 P.2d 687 (1985).

Finally, Habersetzer argues that the alleged conduct did not affect the public interest. Even though private individual contracts typically do not affect the public interest, the likelihood that additional parties will be injured in the exact same fashion turns a private contract into one that affects the public interest. *See Hangman Ridge*, 105 Wn.2d at 790. The evidence in this case is clear: out of two boats constructed for previous customers, at least one of those customers was injured in the same way and through similar misrepresentations as was Meredith.

Habersetzer's Motion for Partial Summary Judgment on Meredith's CPA claim is DENIED.

\* \* \*

There are material issues of fact that cannot be resolved on summary judgment. Habersetzer's Motion for Partial Summary Judgment [Dkt. #25] is DENIED.

IT IS SO ORDERED.

Dated this 7th day of November, 2014.

_Ronald B. Leighton_
RONALD B. LEIGHTON
UNITED STATES DISTRICT JUDGE